## IN THE UNITED STATES DISTRICT COURT
## FOR EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID: http://facebook.com/100006447646043 or EL CHILO JACOBO THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 1:20-mj- 17 <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Bergren, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID: http://facebook.com/100006447646043 (hereinafter referred to as the "Target Account") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice, and have been since 1997. As such, I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations of, among other things,

offenses enumerated in Title 18, United States Code, Section 2516. I have been employed as a Special Agent with DEA for the past 20 years. In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers including four months of DEA basic training in Quantico, Virginia as well as periodic refresher training offered by the DEA. I am currently assigned to the Chattanooga Resident Office.

3.      During my experiences and tenure as a narcotics investigator, I have investigated and participated in investigations of organized criminal groups violating federal drug trafficking laws. As part of my official duties, I have utilized and been involved with most traditional law enforcement techniques, including: visual surveillance, witness interviews, execution of search warrants, the use of cooperating witnesses, seizure of drug evidence, controlled purchases of drug evidence, court-authorized pen registers, court-authorized interceptions of wire communications, and undercover techniques. I have debriefed numerous cooperating defendants and confidential informants regarding the habits, practices, methods, and general behavior of criminal groups engaged in organized criminal activity. I have personally participated in Title III wire intercept investigations, including investigations involving large-scale drug trafficking organizations and drug traffickers. I have received specialized training in conducting drug investigations and have attended training and lectures featuring government attorneys and law enforcement officials.

4.      Over the course of my career, I have participated in numerous arrests of known drug traffickers and their associates. This experience has afforded me an opportunity to observe and investigate methods, schemes, and operations used by organized groups, including the use of

cellular telephones, social media accounts, and digital display paging devices, and the use of numerical codes and code words to conduct the transactions. In addition, I have participated in investigations concerning the concealment of proceeds of controlled substances, including assets, monies, and bank records, and the identification of co-conspirators through the use of drug ledgers, telephone toll records, telephone bills, photographs, social media accounts, and financial records. These investigations have resulted in the arrests of individuals who have smuggled, received, and/or distributed controlled substances, including methamphetamine, cocaine hydrochloride, cocaine base, heroin, and marijuana, as well as the seizure of controlled substances and proceeds of the sale of controlled substances. I know based upon my training and experience that narcotics traffickers and money laundering organizations routinely use several operational techniques. These practices are designed and implemented to achieve two paramount goals: first, the successful facilitation of the organization's illegal activities that consist of the transportation and distribution of controlled substances and subsequent collection of the proceeds of that illegal activity; and second, minimizing the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of various drug-trafficking offenses, including possession with the intent to distribute and distribution of controlled substances, conspiracy to do

Page **3** of **17**

the same, and the use of communication devices to further and facilitate the commission of the above listed offenses, in violation of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) have been committed by the user of the Facebook page affiliated with user ID: http://facebook.com/100006447646043. There is also probable cause to believe that the search of information described in Attachment A will yield evidence of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

7. The United States, including the Drug Enforcement Administration, is conducting a criminal investigation of Christopher AKERS, Megan KNIGHT and others regarding possible violations of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b).

8. On October 31, 2019, United States Magistrate Judge Susan Lee signed a search and seizure warrant for location information for 423-681-9289 (Target Cell Phone #1), utilized by Megan KNIGHT. This warrant was executed and DEA Chattanooga started to receive location information of her telephone. As a result of this information, law enforcement was able to verify that Megan KNIGHT traveled to Dunwoody, Georgia, on November 2, November 4, and November 15, 2019. These trips were of a short duration and KNIGHT returned to Chattanooga, Tennessee, after these trips.

9. On November 18 2019, the DEA Chattanooga conducted surveillance on Megan KNIGHT and her criminal associates. As a result of this surveillance, Tennessee Highway Patrol (THP) conducted a traffic stop on KNIGHT, Perry SHELBY, and Lolita EASON. During that traffic stop, SHELBY fled on foot and was apprehended. As result of the stop, approximately five kilograms of methamphetamine, a small amount of heroin, and psychedelic mushrooms were seized. SHELBY was arrested and transported to jail on State charges. KNIGHT and

EASON indicated they wanted to co-operate with law enforcement and were not charged at that time.

10.    During an interview with KNIGHT, KNIGHT advised that she had been purchasing three to five kilograms of methamphetamine per week from "PRESENT" in Atlanta, Georgia, and his brother, "CHI," who resides in Mexico, since September 2019.  KNIGHT provided information about "PRESENT" to include his apartments, vehicles, and phone numbers. KNIGHT advised that she communicated with "PRESENT" and "CHI" via telephone calls, text messages, and Facebook Messenger Target Account.

11.    KNIGHT stated "CHI's" Facebook User name was "EL CHILO JACOBO." KNIGHT relayed that "CHI" used to reside in Georgia, but was now in Mexico because after he got out of prison he went back to Tuxpan, Veracruz, Mexico, and that she was currently talking to "CHI" while he was in Mexico and meeting the brother, "PRESENT," in Atlanta, Georgia. KNIGHT provided the phone number of "PRESENT" as 470-416-1121 and "CHI" as 52-7831505076.    KNIGHT provided and showed law enforcement the Facebook user ID: http://facebook.com/100006447646043 or "EL CHILO JACOBO" and advised that was the account that she communicated with the brother "CHI" in Mexico on.  KNIGHT showed your affiant numerous messages with Facebook user ID: http://facebook.com/100006447646043 in reference to payments for drugs received.

12.    KNIGHT further stated "CHI" would send her the addresses to obtain the meth and she would again contact him once she got home with the load safely.  KNIGHT advised that "CHI" would let "PRESENT" know to be ready and when she arrived.  KNIGHT would talk to "PRESENT" to let him know she was coming and when she arrived. KNIGHT advised that she

paid "PRESENT" the majority of the money but would also send money electronically to "CHI" in Mexico.

13.     KNIGHT explained that "CHI" would provide names over the Target Account for KNIGHT to wire money to in Mexico.  These names are in her phones and all the subjects lived in Veracruz, Mexico.  KNIGHT advised that she also had other people, to include but not limited to Susan VRADENBURGH, Perry SHELBY, and Chris AKERS, wire money to "CHI" in Mexico for drug payments.  These amounts varied but most were $2,000.00 at a time.

14.     KNIGHT provided her passwords for her flip phone, which utilized number 386-523-6999, and her smart phone a Galaxy note 10, which utilized number 423-681-9289. KNIGHT signed a consent to search form for the phones.  KNIGHT advised that she utilized FB Messenger, text messages and phone calls to talk to customers and her SOS.   A review of her phones by RAC William Wise and Your Affiant showed numerous drug and drug money related FB Messages and texts with "CHI," "PRESENT," Chris AKERS, Perry SHELBY, Megan CANTRELL and "Bubba B" and others as well as photos of receipts from wiring money to "CHI's" people.

15.     Below, are photographs, of Facebook messages between KNIGHT and the Target Account, taken during the consent search of KNIGHT'S phone.









16.     Based on your Affiant's training and experience, my knowledge of this investigation, and what Megan KNIGHT advised I believe that in the majority of the above communications, "CHI" was providing KNIGHT with names to wire money to and KNIGHT was sending pictures of the money transfer confirmations. Your Affiant believes the first conversation on November 7, 2020, at 12:44 pm, to be a message that Megan KNIGHT forwarded to "CHI" letting him know she replayed a threat in Spanish about killing someone if they don't give them their money. These conversation occurred between Megan KNIGHT, who was utilizing /her Facebook account messenger service, and the Target Account.

17.     The intelligence gathered in this investigation, including source interviews, search warrants, surveillance, telephone analysis, and financial information indicates that Megan KNIGHT and her criminal associates are receiving methamphetamine directly from elements in

Mexico. KNIGHT frequently sends money to numerous recipients in the in Mexico; KNIGHT frequently is in contact with Mexican phone telephone numbers. Based on your Affiant's training and experience, my knowledge of this investigation, your Affiant believes this to be true.

18. Your Affiant has provided a preservation request to Facebook formally requesting preservation of all stored pages, communications, records, and other evidence contained within and related to the Target Account. Facebook indicated that it would preserve all such information until March 3, 2020.

19. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

20. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

21. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

22.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

23.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

24.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link

to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

25.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

26.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

27.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

28.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

29.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

30. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

31. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

32. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

33. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

34. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

35. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

36. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

37. Based on the forgoing, I request that the Court issue the proposed search warrant.

38. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

39. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

Page **16** of 17

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### REQUEST FOR SEALING

40.     I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation.  Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Andrew Bergren
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me on February _____11____, 2020


HON. CHRISTOPHER H. STEGER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID: http://facebook.com/100006447646043 or EL CHILO JACOBO THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 1:20-mj- 17 **Filed Under Seal** |

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID **http://facebook.com/100006447646043 or EL CHILO JACOBO** that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

Page **1** of **1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER ID:
http://facebook.com/100006447646043 or
EL CHILO JACOBO THAT IS STORED AT
PREMISES CONTROLLED BY FACEBOOK
INC.

Case No. 1:20-mj- 17

**Filed Under Seal**

## ATTACHMENT B

**Particular Things to be Seized**

I.      **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession,

custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is

located within or outside of the United States, including any messages, records, files, logs, or

information that have been deleted but are still available to Facebook, or have been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the

following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including  full name, user

identification number, birth date, gender, contact e-mail addresses, physical

address (including city, state, and zip code), telephone numbers, screen names,

websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts

and other Facebook activities **January 2019 to Present.**

(c)     All photos and videos uploaded by that user ID and all photos and videos

uploaded by any user that have that user tagged in them **January 2019 to**

**Present**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user **January 2019 to Present** including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

Page **2** of **4**

(l)     All records of Facebook searches performed by the account **January 2019 to Present;**

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) have been committed by the user of the Facebook page affiliated with user ID: http://facebook.com/100006447646043, since January 2019, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) the distribution of controlled substances

Page **3** of **4**

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).